# EXHIBIT "A"

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTOPHER MARK PARIS, and
OXEBRIDGE QUALITY RESOURCES
INTERNATIONAL, LLC

Plaintiffs

v.

WILLIAM LEVINSON,
LEVINSON PRODUCTIVITY
SYSTEM, PC, a Pennsylvania
Corporation, MARC TIMOTHY
SMITH, individually, and d/b/a
CAYMAN BUSINESS SYSTEMS,
GUBERMAN PMC, a Connecticut
Corporation, DARYL GUBERMAN,
an Individual, DONALD LABELLE, an Individual

Defendants

_____/

## VERIFIED COMPLAINT

COMES NOW the Plaintiffs, Christopher Mark Paris and Oxebridge Quality Resources

International, LLC, through undersigned counsel, (collectively herein referred to as "Plaintiffs")

and files this case against William Levinson, Levinson productivity System, PC, Marc Timothy

Smith, d/b/a Cayman Business Systems, Guberman PMC, Daryl Guberman, Donald LaBelle

(collectively the "Defendants"), and states in support as follows:

## NATURE OF THE ACTION

This is an action for COUNT I: DEFAMATION/LIBEL, COUNT II: TORTIOUS

INTERFERENCE WITH A BUSINESS INTEREST, COUNT III: COUNT III -- FEDERAL

ANTI-CYBERSQUATTING (ANTI-CYBERPIRACY) (15 U.S.C. § 1125(D)(1)(A)), COUNT

IV - TRADEMARK INFRINGEMENT (15 U.S.C. § 1114), COUNT V FLORIDA UNFAIR

COMPETITION, COUNT VI MISREPRESENTATION OF COPYRIGHT CLAIMS UNDER

THE DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA") 17 U.S.C. § 512, COUNT VII:

ABUSE OF PROCESS, COUNT VIII: WIRETAPPING, VIOLATION OF FLORIDA STAUTE

934.03, COUNT IX - INTERCEPTION OF ELECTRONIC COMMUNICATIONS IN

VIOLATION OF THE WIRETAP ACT, 18 U.S.C. § 2511(1)(A), COUNT X: FOR

DISCLOSURE OF INTERCEPTED ELECTRONIC COMMUNICATIONS IN VIOLATION

OF THE WIRETAP ACT, 18 U.S.C. § 2511(1)(C), COUNT XI (INVASION OF PRIVACY-

INTRUSION UPON SECLUSION), and COUNT XII: CIVIL CONSPIRACY.

## JURISDICTION AND VENUE

1.      Venue is proper in this Court as the amount in controversy exceeds $75,000.00 and
there is complete diversity of citizenship under 28 U.S.C. § 1332.

2.      This case also contains a federal question 28 U.S.C. § 1331.

3.      Each Defendant violated Federal law, meeting the federal question standard under 28
U.S.C. § 1331.

4.      The interrelated claims against Levinson total in excess of $75,000.

5.      The interrelated claims against Guberman PMC, Daryl Guberman, Donald LaBelle
total in excess of $75,000.

6.      U.S.C. § 1367 permits supplemental jurisdiction over joined claims that do not
individually meet the amount-in-controversy requirements of § 1332, provided that at least one
claim meets the amount-in-controversy requirements *Exxon Mobil Corp. v. Allapattah Services,
Inc.*, 545 U.S. 546 (2005).

7.      This Court has supplemental jurisdiction over "all other claims that are so related . . .

that they form part of the same case or controversy" (§ 1367(a)).

8. The claims against the other defendants are related to the common nucleus of operative facts.

9. The Defendants have all either committed tortious acts directed towards the Plaintiffs in the State of Florida or have established minimum contacts within Florida subjecting them to jurisdiction herein.

10. The lion share of Plaintiffs' clientele and consulting business is in the aerospace industry. Plaintiffs' principal place of business is in the State of Florida. The "heart" of the aerospace industry is in the State of Florida. Thus, the "brunt" of the harm to plaintiffs was and is felt in Florida. Panavision International, L.P. v. Toeppen, 141 F. 3d 1316 (9th Cir. 1998).

11. Plaintiff Christopher Mark Paris ("Paris") is a resident of Tampa, Florida.

12. Plaintiff Oxebridge Quality Resources International, LLC ("Oxebridge") is a Florida Corporation. At all times material, Oxebridge was and is a for-profit limited liability company, organized under the laws of the State of Florida, with its principal place of business located at 1503 South US Highway 301, Tampa, FL 33619.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred upon the Plaintiff by the actions of the Defendants in the Middle District of Florida.

14. Defendant William Levinson ("Levinson") is a resident of Pennsylvania.

15. Defendant Levinson Productivity System, PC ("Levinson Productivity") is a Pennsylvania Corporation.

16. Levinson Productivity and Levinson (collectively "Levinson Entities") have targeted Plaintiffs' customers in the state of Florida, including but not limited to, marketing a competing

seminar to the Plaintiffs in Cocoa Beach and promoted it on his anti-Oxebridge websites, in which he made false claims about causing reputational injury and harm defaming the Plaintiffs.

17.     Levinson and Levinson Productivity's tortious acts directed at the Plaintiffs in Florida caused a substantial pecuniary loss to the Plaintiffs and violated Florida Statute  48.193(1)(f)(1) and 48.193(1)(a)(2).

18.     Levinson has sued Oxebridge and Paris in Hillsborough County, in Case # 17-CA-003804. Six of the seven counts have already been dismissed by the Court.

19.     This new lawsuit is being filed in federal court due to a different common nucleus of operative facts, as well as federal claims of trademark infringement, cybersquatting, as well as a civil conspiracy between the Defendants actively participating across state lines to destroy the professional reputation of Paris' news organization.

20.     Defendant Daryl Guberman ("Guberman") is domiciled in Connecticut.

21.     Defendants Daryl Guberman ("Guberman") and Donald LaBelle ("LaBelle") operate the company Guberman PMC LLC, a/k/a G-PMC LLC a/k/a G-PMC Registrars LLC, (hereinafter "Guberman PMC") based in Connecticut.

22.     Defendants Guberman and Labelle operate a number of other activities, referenced as companies by them, but not verifiable as registered business entities in any state, including IndustrialPR.Net, Manufacturing Partners, American Board of Accredited Certifications, National Food Safety Council, and more.

23.     Donald Labelle is domiciled in Massachusetts.

24.     Labelle, Guberman PMC, and Guberman have availed itself to jurisdiction in Florida pursuant to section 48.193(1)(f)(1) and 48.193(1)(a)(2), Florida Statutes, by committing tortious acts directed at the Plaintiffs, inclusive of, but not limited to illegally recording a phone

conversation of Paris who was in Florida at the time, without Paris's informed consent, and subsequently disseminating the contents of that recording over the world wide web.

25.     The contents of the phone conversation also defamed Paris, accusing him of being bankrupt, when this was untrue.

26.     Labelle, Guberman, and Guberman PMC also harassed Oxebridge clients, such as AM Metals of Orlando FL, and published derogatory information over the world wide web in an attempt to adversely affect Plaintiff's business.

27.     Through their marketing activities, Guberman, Guberman PMC, and Labelle have engaged with clients in the State of Florida, including Collins Manufacturing (Apopka FL), Florida Metal Craft (Winter Garden FL), Innovative Products of Florida (St. Petersburg FL), The Stimpson Company (Pompano Beach FL), and UltraTech International (Jacksonville FL).

28.     Defendant Marc Smith ("Smith") is a citizen of the State of Ohio and does business as Cayman Business Systems ("Cayman") with its principal place of business being in the State of Ohio.

29.     Smith has conducted and directly competed for business in the State of Florida.

30.     Smith has been providing "onsite" and "tailored" programs for twenty-five years to businesses within the State of Florida including but not limited; Pall Aeropower Corporation of New Port Richey, Pasco County, Florida and the Federal Warranty Service Corporation of Tampa, Florida.

31.     Smith, by operating, conducting, engaging in, or carrying on a business venture in the State of Florida, Smith availed himself to the personal jurisdiction in the State of Florida, pursuant to section 48.193(1)(a), Florida Statutes.

32.     Smith availed himself to the personal jurisdiction of the State of Florida when he

solicited consulting services of CAYMAN within the State, pursuant to section 48.193(1)(f)(1), Florida Statutes .

33.     Smith, availed himself to personal jurisdiction in the State of Florida by engaging in substantial business activity within the state, pursuant to Section 48.193(2), Florida Statutes.

34.     By committing the tortious acts described in this Complaint, in the State of Florida, Smith, subjected himself to personal jurisdiction in the State of Florida, pursuant to section 48.193(1)(b), Florida Statutes.

35.     Smith's tortious actions in Florida have been systematic and continuous.

36.     Smith owns, operates and maintains Elsmar.com, which offers a forum board service directed at the quality assurance profession, and which sells advertising space, of which Smith derives income.

37.     Many Florida businesses and individuals have requested and received assistance for industry standards in place of normally paid consulting services from Elsmar.com for example:

> i.   Precision Resource – Florida Division, Inc. (Fort Lauderdale, FL)
>
> ii.  Mike Laurie – Quality Manager, Injection molding of aerospace and medical components (Sarasota, FL)
>
> iii. Sun-Glo Plating Company, Inc. (Pinellas Park, FL)
>
> iv.  Giselle – Quality Manager, Automotive and Manufacturing Industry
>
> v.   Virtual Imaging, Inc. (Boca Raton, FL)
>
> vi.  Gooch & Housego (Orlando, FL)

38.     Elsmar.com is not a passive website nor is it merely interactive, because it requires original input each and every time Elsmar.com and the requesting party engage in industry-specific consultation. Further, "premium file access" can be purchased where editable Master Data File

Sets are transmitted to "premium members", some of which in the State of Florida.

39.     SMITH and CAYMAN's clients within the State of Florida use Elsmar.com to access training manuals and materials essential to Defendants' services.

40.     SMITH's actual interactions establish a physical presence within the State of Florida. The commercial quality and interaction with businesses and individuals within the State of Florida of Elsmar.com establish a "plus" factor to establish sufficient minimum contacts. Cf. Roblor Mktg. Group, Inc. v. Gps Indus., Inc., 645 F. Supp. 2d 1130 (S.D. Fla. 2009).

41.     The Plaintiff previously sued Smith in Oxebridge Quality Resources v. Smith, Case: 8:CV-00011-EAK-TBM, filed in the middle district of Florida.

42.     The Defendants have worked together reposting defamatory material against the Plaintiffs, commenting on the defamatory posts and adding additional defamatory material. The Defendants have stated that their goal was the financial ruin of Paris. Accordingly, their actions have financially damaged Paris and have costs him to lucrative contracts from clients as well as lucrative speaking engagements and seminars.

43.     All conditions precedent to this action have been met through performance, or otherwise.

44.     Plaintiff has retained the undersigned law firm to represent it in this action and is obligated to pay the firm a reasonable fee for its services.

## FACTUAL ALLEGATIONS

## I.     CHRISTOPHER PARIS AND OXEBRIDGE QUALITY RESOURCES, LLC

45.     Oxebridge Quality Resources was started by Christopher Paris in 1999. Since that time Oxebridge has grown in both size and scope of services, serving larger organizations and utilizing some of the best minds in ISO 9000 implementation and consulting.

46.      The ISO 9000 is a family of quality management systems standards is designed to

help organizations ensure that they meet the needs of customers and other stakeholders while

meeting statutory and regulatory requirements related to a product or service. Essentially, the

certification process serves as a compliance standard for third party audits within particular

industries.

47.      Oxebridge modernized the traditional practice, making it much quicker to obtain

certification levels.

48.      Oxebridge specializes in aerospace, with companies such as Lufthansa, JetBlue, and

Space X having traditionally been among its core clients.

49.      Oxebridge trains companies on how to obtain the requisite certifications.

50.      In some instances, these certifications allow for companies to obtain lucrative

contracts with the federal government, which would otherwise be unattainable.

51.      In addition, Oxebridge acts as watchdog and whistleblower in the aerospace quality

field.

52.      Paris runs the website www.oxebridge.com, which essentially functions as a media

outlet, with news articles and opinion pieces written by Paris, which are at times satirical or

humorous in nature, and at other times serious reports on industry news, practices or

controversies. Paris has provided independent reporting on the industry to the US Dept of

Defense, the US Food and Drug Administration, NASA and other government agencies.

53.      Paris first registered and did business as Oxebridge in 1999.

54.      On October 17, 2006 Paris registered the trademark for Oxebridge Quality Resources,

Inc. While this mark subsequently lapsed for not timely filing paperwork with the USPTO, Paris

continued exclusively using the trademark and held common law trademark rights therein at all times.

55.      On December 12, 2017 registered the trademark for Oxebridge Quality Resources, International LLC ("Oxebridge Registered Trademark") (See attached exhibit "1").

56.      Paris is also a published author and has published numerous books on the ISO standards.

57.      Paris has been published in third party journals including Quality Systems Update, Japan Today and InfoSec Island, and has been cited in peer-reviewed journals such as the British Medical Journal (BMJ) as well has contributed reporting go mainstream reporting outlets such as Marketwatch, for his work related to ISO certification industry oversight and reporting.

58.      Paris also maintained employment with Pulse Medical of Blue Ridge GA from 2010 through 2018, in the position of Quality Manager.

## II.   WILLIAM LEVINSON AND LEVINSON PRODUCTIVITY SYSTEM, PC.

59.      Levinson is a conservative author and could be considered part of the "Alt Right" movement.

60.      Levinson has published hundreds of articles spanning at least 15 years on alt-right websites including The American Thinker and Israpundit. His articles have been republished and favorably reviewed on the websites of white nationalists and the Ku Klux Klan, including The Daily Stormer and Stormfront.

61.      In response to a negative book review Paris wrote regarding Levinson's book on risk management, Levinson republished false claims that Oxebridge, not Paris, was bankrupt, falsely claiming on Facebook, Twitter and LinkedIn that Oxebridge was "bankrupt" and suggesting the company did not actually exist, calling it an "empty storefront."

62.      Also, Levinson made a false claim that Paris supported terrorism.

63.      Levinson registered the domain name www.oxebridge.biz in 2017 and hid his identity by enabling domain privacy protection services. This website then contained defamatory information against Oxebridge and Paris, including false allegations of crimes, which Levinson later admitted he had authored.

64.      Levinson also created the website "Osteinfo.net" which included the exact same material as the Oxebridge.biz website, also registering this through means to hide his identity. Levinson has admitted in subsequent documentation that he was also the creator of this site, and removed it upon advice of counsel, but the reputational injury was already inflicted.

65.      Levinson also created the website "oxefake.com" which included the exact same content as the other two sites.

66.      On January 19, 2018, Paris initiated a complaint with the World Intellectual Property Organization ("WIPO") Arbitration and Mediation Center, alleging that Levinson's registering of the Oxebridge.biz domain was done in bad faith and infringed on Paris trademark and intellectual property.

67.      WIPO noted that the website was solely comprised of attacks on Mr. Paris and Oxebridge (See attached Exhibit "2").

68.      In a February 22, 2018 decision, WIPO found that (i) the disputed domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and (ii) the respondent has no rights or legitimate interests in respect of the disputed domain name; and (iii) the disputed domain name has been registered and is being used in bad faith.

69.     WIPO noted the following: "Here, the Domain Name is identical to the distinctive element of the Complainant's trademark and does not include words that would clearly identify it as unaffiliated with, or critical of, the Complainant, as in the "sucks" cases. See WIPO Overview 3.0, section 2.6.3. Moreover, for the purposes of the Policy, the Panel cannot consider a criticism site entirely "noncommercial" in purpose or effect when it is operated, as in this case, by a competitor and lists third-party alternatives to the Complainant. It is essentially inconsistent with the concept of "fair use" (see *id.*, section 2.5) to make misleading use of a competitor's trademark in a domain name in this manner."

70.     WIPO went on to note that "The Panel finds it inconsistent with good faith, within the meaning of the Policy, to use a domain name misleadingly similar to a competitor's trademark for a website largely devoted to disparaging the competitor's business."

71.     Levinson had used images that belonged to Paris not only on oxebridge.biz, but also on osteinfo.net and oxfake.com. All the aforementioned websites are no longer in operation, but remain under Levinson's ownership. Levinson registered the websites for the sole purpose of criticizing Paris and disparaging a business competitor without regard for the veracity of his claims.

72.     WIPO also noted that :

(1) That Levinson's site at Oxebridge.biz infringed on the Oxebridge trademark as it was "confusingly similar" to the official Oxebridge website at Oxebridge.com.

(2) That Levinson's site did not fall into fair use allowances, ruling: "For the purposes of the Policy, the Panel cannot consider a criticism site entirely 'noncommercial' in purpose or effect when it is operated, as in this case, by a competitor and lists third-party alternatives to the Complainant. It is essentially inconsistent with the concept of 'fair

use'… to make misleading use of a competitor's trademark in a domain name in this manner."

(3) That Levinson intentionally registered the site "in bad faith," ruling: "The Respondent argues that the Domain Name was not registered 'primarily' to disrupt the Complainant's business; he chiefly wanted to defend himself from the Complainant's false and defamatory statements. That is certainly a major theme of the Respondent's former website, but the headers and much of the content in the screenshots concern the Complainant's consulting business and its principal's perceived errors. The Panel finds it inconsistent with good faith, within the meaning of the Policy, to use a domain name misleadingly similar to a competitor's trademark for a website largely devoted to disparaging the competitor's business. The Panel concludes that the third element of the Complaint, bad faith, has been established."

73.     As a result of Levinson's actions, Paris has lost lucrative contracts with his clients and also lost lucrative speaking engagements.

74.     Levinson then contacted, through email and phone calls, at least 30 – 50 of Paris' former clients, after downloading a list of said clients from the Oxebridge website. For each of the clients contacted, Levinson sent at least three emails, and in some cases sent as many as 15 emails to each client. In the communications, including the phone calls, Levinson disparaged Paris and Oxebridge, in a brazen attempt to have the clients distance themselves from Paris. Levinson later wrote, in defective pre-suit notices that his intent was for Paris to have "less O-Fans." The term "O-Fans" was admitted by Levinson later to reference Oxebridge's clients.

75.     In response to the Levinson emails and phone calls, three clients – New Pig Corporation, Pulse Medical and SpaceX -- of Paris terminated their relationship with Paris and

Oxebridge. In each case, these clients had utilized Paris for over a decade each.

76.     Levinson attacked and defamed Paris on the following websites or mobile

applications[1]:

    i.     LinkedIn
    ii.    Facebook
    iii.   Twitter
    iv.   Travelocity
    v.     Amazon
    vi.   USENET Newsgroups
    vii.  Ripoff Report

77.     Levinson went beyond the normal scope of competition with a business competitor,

publishing on his websites disparaging information about Paris' wife's business and even

publishing Paris' home address, along with any corresponding liens to his house, which would be

a criminal violation under cyberstalking and doxing laws.

78.     Accordingly, Levinson effectuated his desire to adversely affect Paris' business

interests.

79.     On the contrary, while the Levinson Entities have accused Paris and Oxebridge of

defamation, but the fact of the matter is that Oxebridge, as a member of the press core, only

published truthful information regarding Levinson, providing links to third-party supporting

documents or original publications, allowing readers to verify the truth for themselves.

## LEVINSON'S DEFAMATORY TWEETS

80.     Throughout January and February of 2017, Levinson tweeted multiple tweets on his

Twitter account @levinson_bill falsely claiming that Oxebridge is an "bankrupt empty

storefront," then posting links to the personal bankruptcy filings of Paris which included

---

[1] There are additional websites in which Paris was defamed, which are anticipated to be the subject of discovery.

personally identifiable information, including his address, names of relatives, contact information and financial disclosures. The statements were false in that Oxebridge has never filed bankruptcy (See attached Exhibit "3")[2].

81.     Tweeting again in January 2017, Levinson falsely claimed "Oxebridge defamatory website smears ASQ. Successful action against it for IP misuse. Bankrupt per screenshot." All three claims were patently false: Oxebridge has never published any defamatory material about ASQ; ASQ has never once requested a retraction or correction for any reporting done on it since 2000; there was never any successfully legal action taken against Oxebridge or Paris for intellectual property misuse by any party, ever; and Oxebridge has never filed bankruptcy. (See attached Exhibit "3").

82.     Continuing his tweets, Levinson falsely claimed Paris "lies about IRS investigating ASQ." (See attached Exhibit "3"). In fact, the IRS wrote to Paris and indicated an investigation has been initiated, with the IRS using the word "investigation" directly.

83.     In one Tweet (See attached Exhibit "08"), Levinson falsely claimed Oxebridge supports terrorism by tweeting, "#oxebridge reinforces implied excuses for Hamas terrorism."

84.     In February 2018, Levinson again tweeted (See attached Exhibit "52") that Oxebridge supports terrorism, writing, "Disturbing. #oxebridge joins supporters of Palestinian terrorism by calling it 'murder' when a soldier or copy shoots someone for reasonable belief that the person is about to detonate a bomb." In fact, Levinson took a quote of Paris out of context, from an article in which Levinson discussed murdering a 13-year-old Palestinian girl; at no point in Levinson's original post did he mention anything about the girl holding a bomb and his fantasy being in self-defense.

---

[2] The exact dates of specific tweets will be a subject of discovery.

85.     In January 2018, Levinson tweeted (See attached Exhibit "53")  a video of a "man being ripped apart by dogs," writing, "'Man' throws stones at dogs for no good reason (like rabid dog himself), wonders why he gets bit" The tweet was made on the @Oxebridge_watch accunt, which prior to that had been entirely dedicated to defaming Paris and Oxebridge; any reasonable reader would thus conclude the violent video was aimed at Paris, since the @Oxebridge_watch account never addressed any other party.

86.     Paris reported this tweet to law enforcement as a threat against his life. Accordingly, Levinson later removed the incendiary clip. Discussions with the Federal Bureau of Investigation's Scranton PA office resulted in an open an investigation into Levinson by the counter-terrorism unit for threats against others.

87.     Later, in March 2018, Levinson added more defamatory tweets to the @Oxebridge_watch feed (See attached Exhibit "11") , falsely claiming that Paris engaged in "abuse of DICWP to threaten others with sanctions." Paris is covered, in fact, by the Defense Intelligence Community Whistleblower Program and has provided reporting directly to the US Dept. of Defense's Inspector General's office.

**LEVINSON'S MULTIPLE INSTANCES OF DEFAMATION ON AMAZON.COM**

88.     In January 2017, Paris purchased a book by Levinson on risk management through Amazon, and then published a review of the book as a "Verified" customer on the Amazon website.

89.     Paris published a book review of a book written by Mr. Levinson on the subject of ISO 9001 and "risk-based thinking," which was critical of the book; this was published on Amazon. The review was then republished by Paris on the Oxebridge website.

90.     For example, in February 8 2017, at 8:45AM Levinson made the false claim that

Paris was "bankrupt" and a "loser" in response to a book review posted by Paris on Amazon (See attached Exhibit "4"). In that same comment, Levinson falsely accused Paris of making "false accusations of crimes and unprofessional conduct against dozens of quality professionals and also organizations like major registrars, ANSI, ANAB, ISO, and the American Society for Quality." It should be noted that at no point did any of those organizations ever question any reporting done by Paris or ever ask for a retraction in the 18 years of the Oxebridge website's reporting history.

91.      The aforementioned post was deleted by Amazon, but Levinson then re-posted his comments again at 9:48AM (See attached Exhibit "5"), this time adding additional comments that Paris was "a liar," and that "Somebody who is ethically capable of lying to Amazon readers and to the audience of his Web site is ethically capable of lying to customers, peers, and clients, which is probably why few people will hire this individual after they see his Web and social media postings." In this post, Levinson reiterated the false claim that Paris made "false accusations of crimes and professional misconduct directed at dozens of quality professionals as well as certification bodies and organizations like ANSI, ANAB, ISO, and the American Society for Quality."

92.      There was a third incident of the post on Amazon (See attached Exhibit "6"), in which Levinson wrote that Paris "blamed auditors, with language implying incompetence or worse, for a SpaceX rocket failure." In reality, at no point did Paris ever blame any auditor for the SpaceX rocket failure. In this posting, Levinson boasted of his achievement in getting SpaceX to cease its' relationship with Paris by saying, "Somebody at SpaceX must have come across this Web page during the past couple of days and read Chrissy the riot act because he took the page down today along with EVERY ONE of his other SpaceX pages," and " Paris'

achievement may (based on the sudden disappearance of all his SpaceX related pages) have cost him his relationship with SpaceX."

93.     The full number of posts on that site are unknown, but the harassing posts by Levinson were deemed a violation of the Amazon Terms of Service (See attached Exhibit "7").

94.     Eventually, Levinson's book was removed from the Amazon store entirely.

95.     Subsequently, Paris discovered Levinson's political writings and published articles on this subject which directed readers to articles written by Levinson in *The American Thinker*.

96.     In retaliation, Levinson falsely accused Paris of crimes, stated that his company was bankrupt when this was untrue, and accused Paris of supporting terrorism.[3]

97.     Levinson launched a continuous and systematic attack on Oxebridge in an effort undermine the reputation and credibility thereof and to destroy the Paris Entities' business reputation.

## LEVINSON'S TORTIOUS INTERFERENCE WITH OXEBRIDGE'S CLIENTS

98.     SpaceX General Counsel David Harris spoke with Levinson, which resulted in SpaceX demanding the removal of its name from the Oxebridge website.

99.     From February through March of 2017, Levinson emailed at least 30 clients of Paris after obtaining the list of clients from a referral list which was published on the Oxebridge website. Each client received between 3-15 emails loaded with defamatory statements.

100.     On one email dated February 15th, 2017, Levinson fclaimed Paris had been "circulating disparaging and quite possibly defamatory material about me and also about quality management professionals whom I know. It is of course up to you how you want to address similar disparaging material he publishes about certification bodies (including those of his own

---

[3] Paris did file personal bankruptcy in 2016 to reorganize debts and liabilities after divorce proceedings, but Oxebridge Quality Resources and/or any business interest never filed bankruptcy.

clients), ISO, ANAB, ANSI, and the American Society for Quality," (See attached Exhibit "12").
However, in reality no defamatory material was ever published about any of of the
aforementioned parties. Also, at no point did any of those organization ever requested a
clarification or retraction since the Oxebridge website launched in 2000.

101.    In that same email, Levinson falsely claimed Paris "blames his client's AS9100
certification body for loss of a SpaceX rocket while he uses his association with SpaceX to
promote himself, and he also uses SpaceX as a reference," (See attached Exhibit "12").

102.    On February 22, 2017, Levinson sent the Oxebridge client list a second bulk email
again reiterating the false claim that Paris "apparently blames his own client's AS9100
certification body for losing a Falcon rocket," (See attached Exhibit "13").

103.    The article in question did not blame an auditor for the rocket failure, but simply
asked why the auditors were not included in the resulting investigation.

104.    Stemming from February 28, 2017 into March 2017, Levinson sent the Oxebridge
client list a second bulk email (See attached Exhibit "14"), which falsely claimed that Paris
"attacked the reputations of other people, professional bodies, and certification bodies—
including those of his own clients. His false accusations range from unprofessional conduct to
crimes."

105.    In an email to Jon Young, an Oxebridge Client and the owner of VForge in Colorado,
Levinson falsely claimed that Paris' "Web page which encourages people to upload single-user
licensed copies of ISO standards to cloud servers in explicit contravention of the licensing
agreement shown below. Even if he means this as a joke, it's a very irresponsible one given the
potentially serious legal consequences to anybody who acts on it—and, as shown below, he
actually did this with an ISO 9001:2015 draft standard as alleged by ISO's attorney,"(See

attached Exhibit "14").

106.     Levinson attached a link to his email with the Paris article, which was intended to be an editorial graphic intended to show that ISO's copyright policy was lacking.

107.     Furthermore, at no time did Oxebridge ever illegally publish any ISO standard. That same email falsely claimed "[a] letter from ISO's attorney—hosted on his own Web site—shows that he actually hosted copyrighted material on his Web site at one time without the owner's authorization." In reality, no copyrighted material was ever published rather Oxebridge was simply exercising fair use as a member of the press core.

**TORTIOUS INTERFERENCE BY LEVINSON WITH PARIS' EMPLOYER**

108.     Levinson sent at least 16 emails to Paris' employer, Pulse Medical of Blue Ridge GA ("Pulse Medical") from the period of February 10, 2018 to March 8, 2018. Attached is a composite of many of the defamatory emails sent to Pulse Medical in an attempt to have Paris terminated from his position (See attached Exhibit "79"). These emails repeated many of the false claims made in the other emails previously sent to Oxebridge's clients.

109.     Levinson then began calling Pulse Medical, speaking directly with employees there about Paris, as well as leaving voice mail messages. The volume and nature of the calls led Pulse Medical's owner to request their IT department block Levinson's emails for "stalking" (See attached Exhibit "49") and then to block his phone calls, indicating "He has been asked to stop calling but he continues to do so" (See attached Exhibit "50") (See attached composite Exhibit "61"). Accordingly, Levinson's email accounts for incoming messages to Pulse were blocked.

110.     However, in order to circumvent the block on his account, Levinson repeatedly changed his email address, using wlevinson@verizon.net, william.levinson1@gmail.com, wlevinso@hotmail.com, TheBoss@ct-yankee.com, among others.

111.     Levinson demonstrated malicious intent; he was vocal in his desire to interfere with Paris' employment at Pulse.

112.     On February 22, 2017, Levinson wrote to Pulse Medical "I am not sure how LinkedIn shows employees of companies—that is, did Pulse Medical list him in this manner, or did he list himself as a Pulse Medical employee with the accompanying description? If so, is he supposed to advertise himself as 'Risk-Based Debunker at Oxebridge Quality Resources International LLC' while also representing himself as your employee?" (See attached Exhibit "51").

113.     On February 16, 2017, Levinson then posted defamatory comments on the Google Group "misc.industry.quality" writing: "Christopher Mark Paris of Oxebridge Quality Resources International LLC has a long and proven track record of publishing fake news on his company Web site, and on LinkedIn, Twitter and Facebook. This fake news include reckless accusations of professional misconduct, incompetence and even crimes It has been directed at literally dozens of quality management professionals, certification bodies, and professional organizations. I know nothing good or bad about the quality of Paris' work, but the bottom line is that he has proven himself ethically capable of lying to and about peers, sometimes both at the same time" (See attached Exhibit "15"). This post appeared multiple times in various discussion threads on the misc.industry.quality group.

**LEVINSON CREATES INFRINGING WEBSITES TO DISPARAGE OXEBRIDGE**

114.     In March of 2017, Levinson created an entire website dedicated to defaming Paris and Oxebridge, under the domain name "Oxebridge.biz." The website included a mission statement that "The key purpose of this site is to make this individual's statements about us or indeed anybody else not credible." (See attached Exhibit "16").

115.     This site repeated many of the same claims made in the prior Twitter posts and emails

to Oxebridge clients, but expanded on them.

116.    In a March 14, 2017 update to the site, Levinson expanded his site's mission statement, writing, **"This Web site's purpose is to defend the targets of Christopher Mark Paris' commercial disparagement campaign by exposing the falsity of his statements and his proven dishonesty. He has been distributing fake news on his corporate Web site and through Email, LinkedIn, Facebook, and Twitter for the express purpose of damaging his potential competitors (including the owner of this site)."** He then compared Paris to Joe McCarthy (See attached Exhibit "17"). This update also included the following false claims about Paris:

> "*1. Reckless accusations that other quality management professionals put false information on their resumes and use the ISO standards as a source of profit.*" The reporting by Oxebridge proved that the leader of an ISO committee had, in fact, falsified his resume as verified first-hand by the companies listed on the resume. The facts of this reporting have not been disputed even by the individual involved.

> 2. "*A reckless accusation that a major certification body's quality auditor demanded sex from a female quality manager in exchange for not writing nonconformances.*" The reporting of this incident came from interviews directly with the female victim, who asked that her name not be used.

> 3. "*Reckless accusations and imputations of crimes, including statements that identifiable people might go to jail, statements that he has filed criminal complaints against organizations, and use of the word "felony" with regard to specific people and organizations.*" Criminal and civil complaints have been filed on behalf of victims as well as American consumers on the whole, by Paris; where felonies were reported, these

were supported by the laws of the US or country involved, including at least one death

threat. At no time was any crime or potential crime reported by Oxebridge which later

received a request for correction or retraction.

4. *"Disparagement of his own clients' ISO 9001 and AS9100 certification bodies,*

*including reckless allegations that may be libelous."* At no time has the Oxebridge site

disparaged its clients, nor ever received a request for correction or retraction by any such

client.

5. *"A false allegation that our Internal Revenue Service confirmed that it is investigating*

*somebody or something. It is against the IRS's regulations to disclose this."* The IRS

confirmed in writing to Paris that an "investigation" was underway against the party

involved; the word "investigation" was used by the IRS.

117.    On March 18th 2017, Levinson registered a new website under the domain

www.Oxfake.com, under his own name; according to official Whois records (See attached

Exhibit "32"), he later changed his registration information to reflect a pseudonym. Around that

time, Levinson removed the material on Oxebridge.biz and republished it on www.Oxfake.com.

This site included all of the same material originally published on Oxebridge.biz, and added new

defamatory claims. The two sites ran simultaneously for a short period of time.

118.    On both the prior Oxebridge.biz website and the newer Oxfake.com website,

Levinson posted an annotated version (See attached Exhibit "18") of a LinkedIn post previously

made by Paris which included numerous defamatory and false commentaries, including that

Paris "has been trying to damage this organization for years," in an apparent reference to ASQ; a

bizarre claim that Paris is "an Islamophobe"; multiple false accusations that Paris made "overt

threats" to others; a false claim that Paris was engaged in "possible forgery of other people's

statements," and that Paris "has been known to alter statements made by others to meet his own needs"; a false claim that the bankruptcy papers republished by Levinson on the site were "not his personal finances," and marketing of competing Florida training events to compete with that being offered by Paris, with the false claim that his courses are "internationally recognized and do not encourage their customers to take illegal tax deductions."

119.    Levinson also included a false claim that Paris published "abusive" content on LinkedIn that "he will quite likely lose his account as a result," (See attached Exhibit "18"). No content published by Paris was reported by LinkedIn as abusive, and at no point did LinkedIn close Paris' account nor warn Paris about the content posted on his account.

120.    Subsequently, Levinson then published a page claiming, "Past Clients Disown Chris Paris" in which Levinson made the following false and defamatory claims: that Paris engaged in "vicious, unprovoked, and defamatory attacks on other quality management professionals and professional organizations," that Paris published "false and almost certainly defamatory remarks about his own clients' ISO 9001 and/or AS9100 certification bodies on his company's Web site," and that Paris was engaged in the "promotion of intellectual property theft, specifically illegal file sharing," (See attached Exhibit "19").

121.    In a subsequent email to Paris, Levinson admitted he only removed the websites upon the advice of legal counsel, but Levinson then opened a third website at the domain Osteinfo.net. The domain name matches that of a site operated previously by defendant Marc Smith, at Osteinfo.com, and shared the same hosting company and registrar as that of Smith's site.

122.    Again, much of the material originally published by Levinson on Oxebridge.biz and Oxfake.com was yet again republished on Osteinfo.net. This site ran from approximately December 2017 through April of 2018. However, Levinson then added new and increasingly

outrageous defamatory claims against Paris and Oxebridge, including an overt accusation that Paris supports terrorism on a page entitled "Oxebridge Quality Resources International LLC Lines Up with Apologists for Palestinian Terrorism" (See attached Exhibit "20"). Suffice to say the claims of Levinson were categorically false and damaging to Paris' business reputation.

123.      Levinson also claimed "Chris Paris falsely accused people of vandalizing his house." Such an allegation was completely without merit (See attached Exhibit "21").

124.      Furthermore, Levinson falsely claimed that "Oxebridge has a long track record of harming others for no reason at all, and simply continues this behavior in 2018, so you should not believe in the bad things he says about others today," (See attached Exhibit "22"). This claim is also categorically false.

125.      Another instance of defamation is a page entitled "More questionable (at best) statements from Oxebridge" (See attached Exhibit "23") Levinson compared Paris to Joe McCarthy. In addition, Levinson defamed Paris by writing, "Remember that Chris Paris and Oxebridge have made terrible allegations against dozens of people and organizations by name. The credibility of what you see here should tell you something about the accuracy of these allegations. Although we can not prove that these are lies without a reasonable doubt, we have invited our readers to look at them and draw their own conclusions. Also Chris Paris as El Supremo (The Almighty) and 50-something teenage cyberbully. 1. CP criticizes NASA and AS9100 for no reason, just to hear the sound of his voice and score points with his worshipers. 2. CP says auditor (visitor) harassed quality manager in her hotel. 3. "(The auditor) made sexist comments about women, but these were sly enough that no one seemed to notice." 4. CP channels Joe McCarthy 5. CP gets reports from (we think) imaginary friends 6. CP says U.S. Internal Revenue Service confirmed it is investigating X."

126.　While Levinson removed the site's content in April 2018, he allowed a final defamatory claim (See attached Exhibit "21") to remain posted for months, stating "Based on dwindling participation in O-Forum and Oxebridge's Twitter, we doubt that many people are interested in this website (or in Chris Paris's deranged ravings of "Katzenjammer Kids = KKK," "My house was vandaled but I never reported it to the polizei," "Anyone who buys electronic ISO standard violates the copyright," and "I'm the only non-Federal employee covered by DICWP"). At this point, we can say the site's mission, concluding that the bad things Oxebridge and Chris Paris publish about us and others deserve no belief (falsus in uno, falsus in omnibus), has been achieved--not because of this site which has gotten almost no visits except from us & Oxebridge but instead Oxebridge's self-contradictory and incredible answers to it, posted for all its website visitors to see." The quotes represent defamatory statements falsely attributed to Paris, not what Paris ever said or wrote.[4]

127.　Levinson then re-published many of his prior defamatory posts, often verbatim, on third party consumer complaint sites, including Ripoff Report (See attached Exhibit "24"), (See attached Exhibit "26"), (See attached Exhibit "27"), (See attached Exhibit "28"), (See attached Exhibit "29"), and Pissed Consumer (See attached Exhibit "25").

128.　The Ripoff Report comments saw Levinson adding comments to those posted by defendants Smith, Guberman and LaBelle.

129.　The Ripoff Report postings made by Levinson include copy-and-paste material from other publications by Levinson, and include the following URLs, published between February 2017 and February 2018:

---

[4] Additional defamatory material was published on all three of Levinson's websites, and this does not intend to be a full accounting of the total publications.

(1) Chris Paris: The Jeff Rense of Quality:

Management:https://www.ripoffreport.com/reports/oxebridge-quality-resources/tampa-florida-33619/oxebridge-quality-resources-aka-certificate-mill-chris-paris-christopher-paris-oxebrid-1062892

(2) Oxebridge and DICWP, and how we know his home was not vandalized:

https://www.ripoffreport.com/reports/oxebridge-quality-resources/tampa-florida-33619/oxebridge-quality-resources-aka-certificate-mill-chris-paris-christopher-paris-oxebrid-1062892

(3) Oxebridge ISO Standards Users Legal Defense Fund; Questionable Solicitation:

https://www.ripoffreport.com/reports/oxebridge-quality-resources/tampa-florida-33619/oxebridge-quality-resources-aka-certificate-mill-chris-paris-christopher-paris-oxebrid-1062892

(4) I don't agree with most of this review, but Oxebridge has real problems:

https://www.ripoffreport.com/reports/oxebridge-quality-resources/tampa-florida-33619/oxebridge-quality-resources-aka-certificate-mill-chris-paris-christopher-paris-oxebrid-1062892 (See Exhibit "24").

130.     On the Oxebridge legal defense fund site at Fundrazr, Levinson repeated his false claims in the comments section (See attached Exhibit "30")., and made additional false statements, including "A Google search on the site: oxebridge.com and "jail", "crime", "criminal" and "felony" reveal that Oxebridge is the one that does this. Chris Paris and

Oxebridge also accuse people and organizations of doing or being accomplices of crimes such as (1) vandalizing Paris' home, (2) hacking their website, and (3) filing false reports with the Justice Department to get Paris investigated." In fact, defendants Guberman and LaBelle filed a false DOJ complaint under their own names, as evidenced herein; in fact, the Oxebridge website was hacked, as confirmed by multiple third parties.

131.    In March of 2017, Levinson published an article (See attached Exhibit "31") that repeated his claim that Oxebridge was engaged in "illegal file sharing," although did not name Oxebridge or Paris directly. Instead, he referred to the "Yay Cloud" post made by Oxebridge, so that any reasonable readers would make the association.

132.    In January 2018, Levinson opened a new Twitter handle intended purely to defame Oxebridge under the handle @Oxebridge_watch (See attached Exhibit "9"). This account operated between January and April of 2018, and the full number of defamatory tweets is unknown at this time. However, the defamatory tweets included Levinson falsely asserting that Paris supported terrorism by claiming " Paris "makes problematic statements to legal defense donors," falsely accusing Paris of "copyright infringement," claiming "Oxebridge misrepresents Defense Intelligence Community Whistleblower Program," implying Mr Paris suffers from "pathological lying," and falsely claiming that Paris used the "c-word" in reference to a woman."

133.    From January through March 2017, Levinson dedicated posts on his Facebook page to harassing Paris, falsely claiming a "law firm says it compelled Chris Paris to stop misusing" copyrighted materials; this never occurred. In these posts, Levinson admits his intent to damage Paris by stating, "I have also told others you have defamed about your site regardless of whether you badmouthed me to them" and "I also made sure everybody involved learned about your history of being sued successfully by ISO for misuse of intellectual property, your history of

being sued for defamation, your documented history of threatening people's reputations." At no time was Oxebridge ever sued for copyright or trademark infringement, nor for defamation, and at no point has the Oxebridge website threatened anyone's reputations (See attached Exhibit "10").

134.     Throughout the @Oxebridge_watch feed, Levinson repeatedly posted cartoons from the "Katzenjammer Kids," in reference to the defamation website operated by Smith at www.osteinfo.com, for which Smith signed the posts as "The Katzenjammer Kids." Levinson repeatedly posted links to the Osteinfo.com materials from the @Oxebridge_watch feed as well.

135.     On multiple occasions, Levinson tried to have the Oxebridge website shut down. On January 23 2017, Levinson submitted a complaint to Web.com falsely claiming that the Oxebridge website "levies a very wide array of accusations that range from professional misconduct (acting as 'certificate mills,' the counterpart of diploma mills, plagiarism, conflicts of interest" and that Oxebridge was misusing the Web.com service "in connection with any tortious or actionable activity," (See attached Exhibit "55"). Web.com rejected the complaint and found no wrongdoing by Oxebridge. In May of 2017, Levinson contacted the company behind Oxebridge's site security, Sucuri, using a pseudonymous email address and inquiring about a hack that had occurred on the Oxebridge site; Sucuri personnel reported the email to Paris, and confirmed "we did receive some odd email that concerned us" (See attached Exhibit "56"). In September 2018, Levinson posted a response to a comment made by defendant Guberman to Digital Ocean on the commenting platform Disqus. In that comment, Levinson again made numerous false and defamatory statements, including accusations of copyright and trademark infringement (See attached Exhibit "54").

136.     Upon information and belief, Levinson coordinated his attacks against Paris with the

other defendants Smith, Guberman and LaBelle.

137.    Consistently, Levinson published material in support of Smith, Guberman and LaBelle, while elaborating on their content. In exchange, Smith, Guberman and LaBelle published material supportive of Levinson, and added to content published by Levinson. The published materials are often so intertwined between websites operated by all four defendants, fully determining the original source is difficult.

138.    Levinson since admitted that his intent was to directly harm the relationship between Paris and his clients. In a "Pre-Suit Notice" dated November 13, 2017 (See attached Exhibit "58," page 5), Levinson wrote, "You incided your O-Fans to propagate defamatory communications about me to AQI and ASQ, so I needed you to have fewer O-Fans." In a subsequent "Pre-Suit Notice" dated December 30, 2017 (See attached Exhibit "59," page 3), Levinson admitted he uses the phrase "O-Fans" to mean clients of Oxebridge and Paris, by writing, "If you had not incited your O-Fans including your former clients to propagate your lies about me to ASQ and AQI earlier this year, I would not have contacted them earlier this year to expose you as a liar."

139.    The Levison Entities have systemically spread lies and distorted the truth about the nature of Oxebridge, which has caused in excess of $75,000.00 in damages to the Paris Entities, in an amount to be determined at trial.

### III.    DARYL GUBERMAN, DONALD LABELLE, & GUBERMAN-PMC, LLC

140.    Upon information and belief, Daryl Guberman and Donald LaBelle are co-owners and/or managers and/or co-operators of a series of business entities operated under the following names:

     a.   Guberman PMC, LLC

b. "G-PMC Registrars LLC"

c. "G-PMC, LLC"

d. "G-PMC Registrars"

e. "The American Board of Accredited Certifications" a/k/a "ABAC" a/k/a "ABAOC"

f. "Industrial Leaders Group" a/k/a "ILG"

g. "American Machine Shops Network a/k/a "AMSN"

h. "National Food Safety Council" a/k/a "NFSC"

i. "FSM2000"

j. "KOSH 9009"

k. "VOB 9009"

141.    These companies provide, both individually and collectively, various certifications similar to and in competition with, the ISO certifications such as ISO 9001. Guberman and LaBelle openly compete against such ISO certifications in their marketing campaigns.

142.    Upon information and belief, only Guberman-PMC LLC is an actual, registered business entity, and the other entities are merely fictional names use on various websites operated by LaBelle and Guberman to sell their products.

143.    Guberman and LaBelle routinely appear on the websites of their various companies, typically as "Board" members or senior management.

144.    Upon information and belief, Daryl Guberman and Don LaBelle conspired and/or consorted with Levinson and Smith to distribute defamatory materials against Paris and Oxebridge.

145.    Guberman and LaBelle often reposted information originally posted by Levinson or

Smith, in order to disparage and defame Paris.

146.     On June 22 2017, Paris was conducting research into Board members of the

Guberman companies, as it had been uncovered that many such Board members did not exist, or

were actually photos of deceased US veterans. Paris contacted Kelly Rak, who was listed by

Guberman as a Board member, by phone and asked her for comment for his reporting.

Unbeknownst to Paris, Guberman was physically present during that call and began recording a

portion of the call between Paris and Rak without either party's knowledge. Guberman and

Labelle then published the partial recording, without permission of either Paris or Rak, falsely

characterizing the call as being evidence of Paris "harassing" one of Guberman's clients.

147.     Subsequently, Guberman and Levinson disseminated that illegal recording on the

world wide web. Paris filed a police report with the Plainville CT Police Department (See

attached Exhibit "78").

148.     In addition to the covert recording being an illegal act in itself, it defamed Paris by

falsely alleging that his company was bankrupt when this was untrue.

149.     Furthermore, Guberman and LaBelle took the unprecedented action of filing some

fifty frivolous claims under the Digital Millenium Copyright Act against Paris, in an effort to

cripple the Oxebridge site.

150.     The DMCA Notices filed by the Guberman and Labelle lacked a factual basis and

were filed maliciously in order to gain an unfair advantage over a business competitor.

151.     Guberman and LaBelle did not own, nor were acting with authorization of the

copyright holder in order to file the DMCA claims.

152.     Subsequently, Guberman and LaBelle boasted online, through press releases and

YouTube videos, of their DMCA filings, and how they successfully forced Paris to switch web

hosting companies.

153.     Under Section 512(f) the Guberman and LaBelle could not have reasonably believed that the fifty or more submissions made under the DMCA were protected under copyright law.

154.     In August 2012, Defendants Guberman and LaBelle ran a press release (See attached Exhibit "63") announcing Guberman as a quality expert in the ISO 9001 field while simultaneously offering "fully accredited" certification services. This press release caught the attention of Paris, because it appeared to violate international accreditation standards, which prohibit consultants from simultaneously offering accredited certification services.

155.     Paris wrote to Guberman about the press releases in April of 2013. In response, Guberman immediately called Paris back and attempted to sell Paris on the idea of a partnership, going so far as to send his resume with a letter of intent (See attached Exhibit "64"). Guberman was interested in Oxebridge clients in the Southeast and throughout Florida. Paris rejected the offer since Guberman is known in the industry as running a "certificate mill" or an unaccredited operation.

156.     After Paris researched Guberman, he published an unflattering article on his role in the industry, which examined Guberman's  claim that the accreditation rules were "anti-semitic."

157.     In response, Guberman and LaBelle disseminated over 180 "press releases," videos, postings and publications defaming Paris, which were circulated internationally through LaBelle's network of press release distribution companies. The list of known URLs including defamatory content is provided as (See attached Exhibit "33")[5].

158.     The false claims presented in these publications include accusations that Paris runs

---

[5] Since new defamatory material nearly daily, it is impossible to have a full accounting at this time. material nearly daily, it is impossible to have a full accounting at this time.

"an offshore ISO certification scam," that Paris is a "con artist," that Paris was "Christopher

Paris Investigated For Fraud, Copyright Theft, Certification Scams ," that "TAG-176 Chairman

Paul Palmes Asks Daryl Guberman For Assistance With Copyrighted Material Stolen "By

Christopher Mark Paris of Oxebridge.com," that "Oxebridge Owner Chris Paris & Wife Behind

Foreign Scam," that "ISO Headquarters Denounces Oxebridge, Chris Paris; Banned From ISO

Website," that "Oxebridge Owner Christopher Paris Exposed As A Fraud By Industry Insiders."

159.     Guberman and LaBelle have repeatedly accused Paris of hate crimes, including

Nazism,  anti-semitism, racism. Guberman and LaBelle have repeatedly accused Paris of

supporting terrorism, accusing him of "treason" against the United States, and called for his

arrest.

160.     The publications and videos are then cross-promoted through a nest of websites

operated by Guberman and LaBelle, including:

     a)  dguberman.com

     b)  darylguberman.com

     c)  darylguberman.net

     d)  darylguberman.org

     e)  darylguberman.news

     f)  abaoc.org

     g)  darylguberman.me

     h)  darylguberman.live

     i)  mfgpartners.net

     j)  arm9009.com

     k)  darylguberman.blogspot.com

l) g-pmc.com

m) industrialpr.net

n) kosh9009.com

o) vob9009.ocm

p) guberman-pmc-llc.business.site

161. Guberman and LaBelle have published multiple videos on Guberman's various

YouTube channels, which further defamed Paris and Oxebridge. The false claims made in these

videos include accusations of fraud and criminal behavior by Paris, and false claims of fraud on

the part of Oxebridge. The sheer number of false and defamatory comments made in the videos

is too immense to be summarized in full. The videos are then picked up by "mirror sites" who re-

publish YouTube videos, making the full distribution difficult to quantify. The titles of only a

sample of the videos point to the defamatory content, and also point to collusion between

Guberman and Labelle, and defendants Smith and Levinson:

a) SpaceX Dumps Ashamed Chris Paris, Owner Of 'The Oxebridge Scam' Debacle

b) Oxebridge's Chris Paris Envious of Bill Levinson and Other Successful People

c) Oxebridge Nazi Begs ANAB To Sue Daryl Guberman, For Exposing Antisemitism

d) ANAB-TAG 176 Slams Oxebridge Owner Chris Paris as a Liar, Fraud & Copyright

Thief

e) ISO Headquarters Denounces Oxebridge, Chris Paris; Banned From ISO Website

f) ANAB's Randy Doughtery Technical Adviser, Lapdog of Chris Paris Oxbridge

g) The Quality Management Shill Game "Mark Erwin AKA "Christopher Paris-

Oxebridge Quality Resources"

h) ANAB's Randy Dougherty, Condones Intimidation of Woman By Oxebridge's

Chris Paris.

 i) ANAB's Randy Dougherty, and ISOQAR's Chris Paris;A Marriage of

  Misconceptions

 j) Is A.M. Metal Finishing A Victim of Con Artist Chris Paris, Oxebridge?

 k) Elmsar Cove Members Exposed Con Artist Chris Paris, Oxebridge Owner

162. In the videos, Guberman is seen holding images of Paris or the Oxebridge logo, often marked up with the Nazi swastika or other inflammatory symbols.

163. In many of the videos, Guberman holds up the personal bankruptcy papers of Paris, revealing the information on them, while falsely asserting that Oxebridge is a bankrupt company.

164. In one video, Guberman used a wedding photo of Paris' wife, obtained without the authorization or consent of Paris or his wife, which accused her and Paris of an international conspiracy with the Peruvian copyright agency INDECOPI (See attached Exhibit "65"). It should be noted that neither Paris nor his wife have any business, professional or other relationship with INDECOPI.

165. In August of 2017, Guberman and/or LaBelle then posted a number of defamatory articles on the Slideshare feature of LinkedIn. In one (See attached Exhibit "38"), the post including a false claim that "Paris was exposed for fraud, defamation and engaging in racially sensitive activities," which included an image of Paris dressed as Adolf Hitler. The page linked to the materials were published by defendant Smith on www.osteinfo.com.

166. Another Slideshare post repeated the false claim that Paris worked for ISOQAR, and stated than "an online petition online petition is calling for a class action lawsuit against ASQ and ANAB for its support of Christopher Paris and his company Florida-based Oxebridge Quality Resources International." No such petition was ever launched.

167.    Guberman and Labelle then falsely claimed, "Despite dozens of complaints of copyright infringement, business defamation, ongoing character assassination campaigns, and writing disturbing material about minority owned and Jewish-owned businesses, Chris Paris continues to be allowed to speak on behalf of the American Society for Quality. ISO Watch is investigating if the speaking engagements given to Paris was awarded to him as compensation for the smear campaign he engages in to discredit organizations in competition with ASQ affiliates, primarily ANAB and IAF," (See attached Exhibit "39"). One of the claims are true, and no such organization called "ISOWatch" exists.

168.    Another Slideshare post sought to insert Paris' ex-wife into the controversy, via a post entitled "Call For Class Action Lawsuit Against Oxebridge, Chris Paris, Ex-Wife Susan Hicks," (See attached Exhibit "40"). That article made the following false and defamatory claims: "Paris filed for Chapter 7 Bankruptcy in 2016 to evade paying creditors over $600,000 owed in rising business, personal and legal expenses. He is currently being sued for numerous defamation charges and character assassination campaigns against his competitors. He is notorious for publishing racially-motivated material against Jews and other minorities, and he has been accused of dozens of copyright violations by members of the quality community. Chris Paris has become the poster child of failure in the quality community. Ironically, he pretends to be a success despite operating a bogus business with no known customers, or even a single endorsement. Chris Paris has become a joke of the quality community among those that know his antics. In response, Paris has turned to literally begging for money on Linkedin and other social media sites begging for others to pay for his legal endeavors." All of the aforementioned claims are false.

169.    In June of 2017, Guberman and/or Labelle published a number of articles on

Scribd.com, which republished defamatory posts from Smith that appeared on his Osteinfo.com website. In one (See attached Exhibit "42"), the post included false and defamatory statements that "Chris Paris has a meltdown," that Paris uses "sockpuppets" to falsely inflate his support, and that Paris was "begging for money." That post then came with a pop-up (See attached Exhibit "43") added by Guberman and/or Labelle which claimed, falsely, "This document provides 100% FACTUAL VERIFIABLE EVIDENCE about the known scammer Christopher Mark Paris who operates a fake company disguised as a news site. Chris Paris has no customers, was outcast by SpaceX for racial slurs, and was caught numerous times stealing copyrighted images from other websites. Now the Oxebridge owner is trying to conceal his bankruptcy to make people believe he's a 'success.' Here's the evidence you need to protect yourself from this scammer." All of the claims in this published statement are false.

170.     Throughout May, June and July of 2017, Labelle and Guberman filed as many as 30 false and fraudulent Digital Millennium Copyright Act (DMCA) notices to the hosting company of the Oxebridge website, Digital Ocean. See samples under (See attached Exhibit "34"), (See attached Exhibit "35"), and (See attached Exhibit "36"). The complaints were signed under penalty of perjury by Guberman or LaBelle.

171.     In some of the DMCA complaints, Guberman and Labelle claimed to be the copyright owner of content on the Oxebridge website, including publicly disseminated photos of prominent public figures.

172.     In other DMCA complaints Guberman and Labelle claimed to by the copyright owner of editorial graphics created personally by Paris.

173.     Abiding by the law,  Digital Ocean forced Oxebridge to address each claim individually, or face having the Oxebridge site shut down, regardless of whether the claims had

merit. Paris was forced to address approximately 25 of the claims, but Guberman and LaBelle continued to submit more, using a "copy and paste" method to submit them in bulk. Paris was forced to change hosting companies to Inka Hosting, to avoid having the site shut down by Digital Ocean for not timely responding to the voluminous DMCA notices filed by Guberman and Labelle.

174.    Guberman and LaBelle then re-submitted the 30+ DMCA notices to InkaHosting (See attached Exhibit "37"), which resulted in that company then threatening to shut down the Oxebridge site, regardless of whether or not the claims were valid.

175.    In total, at least 60 spurious DMCA notices were submitted by Guberman and LaBelle against Paris, in violation of the law.

176.    Paris then changed hosting companies again, to an offshore hosting company offering a "DMCA Ignore" hosting plan that rejects fraudulent DMCA notices. However, this came at considerable cost and impacted the speed of the Oxebridge site, which remains adversely impacted to this day, resulting in slow page loading times.

177.    The LaBelle website at IndustrialPR.net then published a false and defamatory account which falsely claimed "Oxebridge.com Owner Chris Paris Flees To Offshore Web Host After Receiving Over 50 Complaints of Copyright Violations" (See attached Exhibit "67"). The article attempts to smear Paris and Oxebridge as following business practices of "copyright infringers, white supremacist, terrorist sympathizers, illegal pharmacies, pornography sites and other shady businesses." This site included the following defamatory and false claims:

(1) "According to an ABAC spokesperson, a petition is being drafted calling for the search engines Google and Yahoo to delist Oxebridge.com for multiple DMCA violations. The petition cites Chris Paris, owner of Oxebridge.com fled overnight with his

website to an offshore website to avoid U.S. jurisdiction. The petition states Mr. Paris is

using a seedy foreign web host known for ignoring DMCA takedown notices, and

therefore, leaving copyright owners with no recourse to protect their copyrighted material

from Oxebridge.com.

(2) "Offshore web hosts are commonly used by questionable businesses and individuals

involved in illegal activities such as copyright infringers, white supremacist, terrorist

sympathizers, illegal pharmacies, pornography sites and other shady businesses.

Legitimate U.S. businesses offering legal products and services and paying taxes as

required usually have no need for offshore protection from a seedy foreign web host such

as the one hosting Oxebridge.com."

178.      At some time in 2018, the Labelle owned and/or controlled website mfgpartners.net

ran a similar press release (See attached Exhibit "68") which featured false and defamatory

statements about Oxebridge and Paris, accusing the Paris of antisemitism, racism, and criminal

acts. The LaBelle article also falsely assert that Oxebidge has no clients, and "doesn't seem to be

making any honest money at all", claiming:

(1) "Oxebridge.com is under investigation by the American Board of Accredited

Certifications, and is on the Scam Alert List of IndustrialPR for telemarketing fraud.

Reports show Attorney Generals in several states, including Florida, Connecticut and

New York has received complaints about Christopher Paris and his fraudulent operation

Oxebridge Quality Resources. AMSN could not find a single client endorsement on the

Oxebridge.com website, nor does it appear to have any customers or business references.

In fact, it doesn't seem to be making any honest money at all. However, we did what

seems like an endless number of complaints about Oxebridge Quality Resources
International and Chris Paris all over the Internet. Simply Google "Oxebridge
complaints" and you'll see complaint after complaint about the seedy company. Mr.
Paris, a white man, comes off as a very envious and disturbed individual in the articles he
writes and publishes on his website. He often writes in a distasteful manner about Jews,
African Americans, and woman in leadership roles. He has disgustingly accused a Jewish
businessman of using his own mother's death to promote himself in effort to demeanor
the man among his family, friends, and business associates. He has verbally attacked an
African American woman for being "unqualified" for a leadership role. Christopher Paris
has gone as far as contacting the employer of an Hispanic gentlemen in effort to get the
man fired. The entire business model of Oxebridge.com seems to be attacking the
reputation of successful business people, especially Jews, minorities, and woman. Would
you do business with such a person?"

179.    In January, Guberman and LaBelle filed a false and defamatory complaint to the US
Dept. of Justice, falsely asserting that Paris lied on his bankruptcy filings. Guberman and Labelle
admitted to filing this claim in an email dated January 26, 2017, sent to Paris (See attached
Exhibit "41"). The Dept. of Justice opened an investigation into Paris based on the claims, but
eventually found that the claims were without merit and the complaint was dropped.

180.    On multiple occasions, Guberman and/or Labelle called Paris by phone, leaving
harassing messages and sending abusive texts. In April of 2016, Guberman left a voice mail
indicating that the company managed by Guberman and LaBelle, the American Board of
Accredited Certifications, was rejecting Oxebridge for accreditation because he could not find
any evidence that "Oxebridge had any clients." At no point did Oxebridge ever apply for

"ABAC" accreditation[6].

181.     Also in April of 2016, Guberman left a voice mail to Paris in a "Donald Duck" voice, in which he referred to Paris as a "motherfucker."

182.     On April 9 2017, multiple text messages (See attached Exhibit "44") were received from the phone number 203-556-1493, a number which belongs to Daryl Guberman. In those text messages, Labelle or Guberman falsely claimed, "Chris we're going to be putting gout an article that we offered to donate to your bankruptcy would you like to have an interview," and "U are BROKE," and "Chris if you need any money let Us know we can donate to charities are you a not-for-profit."

183.     On the same day, Paris picked up the phone and found Guberman and LaBelle shouting at him, apparently from a speaker phone they used together; LaBelle told Paris to "come meet us" and said "we're going to kick your ass." A police report was filed in that case with the Agawam MA police department, under file number 17-5223. Paris received additional harassing texts from Guberman as he was filling out the police report.

184.     Throughout 2017, the Guberman/Labelle website at aboac.org included a false statement (See attached Exhibit "45") that Paris "has been harassing several of our board members and threatening our leadership team after we reported his bogus ISO certification enterprise to authorities." and "Paris is currently under investigation by the Anti-Defamation League (ADL) for racists remarks and threats against Jewish businessman Daryl Guberman, one of our founders."

185.     On January 18, 2017, LaBelle posted a press release (See attached Exhibit "46") on his profile for IndustrialPR.Net, a company operated by LaBelle, falsely claiming "Known

---

[6] Evidence of the original recordings have been preserved.

Copyright Infringer Oxebidge.com slammed for closing Elsmar Cove Forum." In fact, the
Elsmar Cove forum was temporarily shut down by Smith as a PR stunt to defame Paris, and at no
time did Oxebridge infringe on copyrights.

186.    In a comment (See attached Exhibit "46") posted the same day on that IndustrialPR
post, Guberman falsely claimed, "I contacted Paris and offered him a donation for his bankruptcy
about 2 weeks ago and he broke down crying and his words were so choked that I could hardly
understand hi - Chris I know your reading this you still need money for food, to assist your
family in anyway please call me 203-556-1493 You write about me almost daily attacking my
character but I forgive you chris."

187.    Guberman and Labelle published a false and defamatory post (See attached Exhibit
"60") on the Labelle -owned website mfgpartners.net which made a host of false and defamatory
accusations, inclusive of the following:

(a) "Please beware of Oxebridge Quality Resources International, an offshore enterprise
operating a bogus certification and accreditation scheme. Mr Paris and his web host has
been reported to the Federal Trade Commission (FTC) for copyright infringement and the
theft of personal photographs, logos, corporate certificates, and other copyrighted
material stolen from various websites. Oxebridge.com is under investigation by the
American Board of Accredited Certifications, and is on the Scam Alert List of
IndustrialPR for telemarketing fraud. Reports show Attorney Generals in several states,
including Florida, Connecticut and New York has received complaints about Christopher
Paris and his fraudulent operation Oxebridge Quality Resources. AMSN could not find a
single client endorsement on the Oxebridge.com website, nor does it appear to have any
customers or business references. In fact, it doesn't seem to be making any honest money

at all. However, we did what seems like an endless number of complaints about Oxebridge Quality Resources International and Chris Paris all over the Internet. Simply Google "Oxebridge complaints" and you'll see complaint after complaint about the seedy company. Paris, a white man, comes off as a very envious and disturbed individual in the articles he writes and publishes on his website. He often writes in a distasteful manner about Jews, African Americans, and woman in leadership roles. He has disgustingly accused a Jewish businessman of using his own mother's death to promote himself in effort to demeanor the man among his family, friends, and business associates. He has verbally attacked an African American woman for being "unqualified" for a leadership role. Christopher Paris has gone as far as contacting the employer of an Hispanic gentlemen in effort to get the man fired. The entire business model of Oxebridge.com seems to be attacking the reputation of successful business people, especially Jews, minorities, and woman. Would you do business with such a person?" Every single statement therein is false. The original post also linked to defamatory material published by Defendant Smith on Google Groups."

188.    A similar post (See attached Exhibit "62") was made in 2018 by Guberman and/or Labelle on their website at abaoc.org repeats many of the same claims, and falsely claiming "The American Board of Accredited Certifications has received numerous complaints about a Chris Paris, owner of Oxebridge Quality Resources International pushing his bogus accreditation scheme," and accusing Paris of living in a "Peruvian villa" and having his "strings pulled" by the "ISO/IAF/ANAB cartel." None of the claims are true.

189.    The Guberman website located at dguberman.com, includes an entire page (See attached Exhibit "47") dedicated to defaming Paris and Oxebridge. The posts are dated between

the end of January 2017 to present. This page includes multiple links to Guberman's YouTube videos as well as material published by defendants Smith and Levinson.

190.　　　The following page of defamatory material was posted by Labelle, http://industrialpr.net/oxebridge-com-owner-chris-paris-flees-to-offshore-web-host-after-receiving-over-50-complaints-of-copyright-violations.

191.　　　In addition, Guberman and LaBelle called Paris former employer, Pulse Medical, multiple times throughout 2015 to 2017, with the intent of having Paris fired from the company. In many cases they left messages with reception, but in a few instances calls were put through to the owners, Barb and Gordy Boyce. The calls were so harassing that in April of 2016 Barb Boyce wrote to her attorney documenting one harassing call from Guberman and Labelle (See attached Exhibit "58").

192.　　　Guberman and LaBelle have consistently published material in conjunction and with the support and aid of defendant Levinson. Multiple videos and press releases as shown in (See attached Exhibit "33") promote and link to materials published by Levinson, such as the video "Oxebridge's Chris Paris Envious of Bill Levinson and Other Successful People." The Guberman and LaBelle publications repeatedly repost and/or link to materials published by Levinson. In various Ripoff Report publications, material originally posted by Guberman or LaBelle is then commented on by Levinson, and vice versa. In one article ("Conservative Businessman Accuses Tampa Rival Of Faking Liberal Outrage To Steal Business" (See attached Exhibit "67") written in the blog St. Petersblog, ostensibly submitted to the author by Levinson, Guberman republishes the false claim that Oxebridge was bankrupt.

193.　　　Guberman and LaBelle have similarly published material in conjunction and with the support and aid of defendant Smith.  Multiple videos and press releases as shown in (See

attached Exhibit "33") promote and link to materials published by Smith, such as "Oxebridge owner Chris Paris sued Elsmar Cove and they went out of business." Neither Oxebridge nor the Elsmar website has gone out of business.

194.     The Guberman site includes a defamatory and false statement about Paris related to Smith, and includes material originally published on the Elsmar site. This includes the following false and defamatory statement:

> (a) "Below are just a few of hundreds of comments found on the former Elsmar Cove about Chris Paris and Oxebridge Quality Resources. These comments clearly show what people in the quality community think of Chris Paris. His lawsuit against Marc Smith, former owner of Elsmar Cove was to silence the quality community that was exposing this guy as a whack job. Well, if you think that's harsh, just read what others are saying about this disturbed individual."

195.     The post then repeats material taken from the Elsmar website and other postings by defendant Smith, all of which were ordered to be removed as part of the court's rulings in Oxebridge Quality Resources v. Smith, Case: 8:CV-00011-EAK-TBM, filed in the middle district of Florida.

196.     In the St. Petersblog article (See attached Exhibit "66") , LaBelle likewise published a comment linking to defendant Smith's website at www.osteinfo.com using the pseudonym "Rich Milton," which LaBelle has used for years in press releases issued by his company Industrial PR Net.

197.     Guberman since 2006 has declared himself a candidate for US Senate thus making his actions newsworthy and a matter of public interest.




# DARYL GUBERMAN
# FOR U.S. SENATE
### *The Change Connecticut Needs*

198.    The full amount of damages will either be established at trial or through affidavits that will be submitted to the Court after liability is proven.

### IV.    MARC SMITH AND CAYMAN BUSINESS SYSTEMS

199.    Smith is an ISO consultant and direct competitor of Paris and Oxebridge Quality Resources.

200.    Smith operates his consulting firm and his website at www.elsmar.com out of a home office in Ohio.

201.    Smith first defamed Paris and Oxebridge in January of 2000 on the Usenet newsgroup "misc.industry.quality."

202.    The newsgroups were later purchased by Google and appear as "Google Groups," which Smith has added defamatory content to for the past nineteen years.

203.    Smith's website at www.elsmar.com, called the "Elsmar Cove," is one of the largest forum boards in the ISO and quality industry, of which Smith is the sole administrator and owner.

204.    Since 2000 to the present day, Smith has published false and defamatory material on the Elsmar website about Paris and Oxebridge.

205.    In 2013, Smith demanded five million dollars to remove the defamatory material.

Simultaneously, he published the defamatory content on LinkedIn, Twitter and Facebook.

206.     In 2013, Paris sued Smith in Case: 8:CV-00011-EAK-TBM, filed in the middle district of Florida.

207.     Ultimately, the case concluded with a Joint Stipulation and a Mediated Settlement Agreement, which prohibited Smith from publishing any material about Paris or Oxebridge.

208.     Smith was held in contempt of court for violated the terms of the joint settlement agreement.

209.     J.B. Lorenzo, counsel for Paris and Oxebridge, attempt to reopen that case to address the repeat violations of the joint settlement agreement was denied by the court, necessitating filing the instant lawsuit against Smith.

210.     Smith has since increased his defamation and coordinated his activities with the defendants Levinson, Guberman and LaBelle, whether directly or indirectly.

211.     Smith previously launched two websites aimed at defaming Paris and Oxebridge. The first was www.oxebridge.co, intentionally filed to resemble the official Oxebridge website at www.oxebridge.com. Smith then opened a second website at www.osteinfo.com.

212.     In an attempt to circumvent the court order, Smith registered these sites under the fictitious name "John Peachfarm." Emails sent to "John Peachfarm" were personally answered by Smith.

213.     At the same time, Smith falsely told his Elsmar readers the site was shut down by Paris. This resulted in a flood of attacks and threats made to Paris by disgruntled Elsmar readers. In fact, the site was never shut down, and Smith continues to operate it openly.

214.     Smith claims he retired, yet he continues to market his consulting services as of January 2019, and continues to generate advertising revenue from the Elsmar website.

215.     In 2018, Smith opened the latest website at oxebridgequalitylawsuits.com which makes numerous false and defamatory claims about Paris (See attached Exhibit "48").

216.     A Google search of the entire content of the oxebridgequalitylawsuits.com website, using the search string "site:oxebridgequalitylawsuits.com *.*" provides a list of the individual pages appearing on the site (See attached Exhibit "70") and (See attached Exhibit "71"). Some of these pages are only visible when using the "view cache" feature in Google, but show that Smith uploaded Smith uploaded "accolades" for himself and his Elsmar Business Systems company (See attached Exhibit "71") (See attached Exhibit "72")

217.     Smith writes in the first person ("I") and even titled one page "Marc Timothy Smith - Accolades - Elsmar Cove."

218.     Another page on the oxebridgequalitylawsuits.com, Smith uploaded his personal credentials, all showing his name (See attached Exhibit "73"). The page is titled "Marc T Smith - Lead Auditor Certificate - Elsmar Cove."

219.     On yet another page (See attached Exhibit "74"), Smith uploaded "specifications" and claims to be an expert.

220.     The defamatory statements are as follows (See attached Exhibit "76"):

   a.   "Chris Paris believes there should not be competition. When someone complains like this, they obviously provide inferior products and/or services." At not time has Paris argued for less competition; Smith's accusation that Oxebridge provides "inferior products and/or services" is defamatory on its face.

   b.   "Paris' various and sundry threats over the years against so many people, organizations and companies are legendary." At no point has Paris threatened

anyone.

c. "Paris' one-man-show "Oxebridge" simply can not compete in today's world. Not to mention many people dislike Paris' personality, and many companies have found Paris to be controversial (to say the least) and thus avoid him. Being a "catch all" lawsuit, claims of libel and such are included. Paris' intent was to stifle Smith's free speech to express his opinions." The claims are defamatory on their face.

d. "Neither Paris nor his lawyer hired a forensics analyst. Paris speaks of "fevered dreams" - We do not for a minute doubt that Paris has such dreams." In fact, prior attorney JD Lorenzo did hire a forensics analyst (See attached Exhibit "75").

e. "The reality is, Paris runs a weird Complaint/Fake News website in which he, posing as journalist, complains about various companies, organizations and various standards (not federal, state, national or international regulations). As Paris libels more and more people, companies, organizations, it is understandable that his consulting services are shunned giving him a lot of free time to write the crap he writes. At one time Paris had some clients, or so he claimed at one time. Some were apparently real, some appear to be false. We have confirmed that SpaceX is one company which demanded that Paris remove their name from his website Clients list."

f. "The reality is few people believe Paris has a sincere cause. White the page says $4007 over 2 years, we have screen captures with the start date. In fact it has taken Paris almost 3 years to collect pennies considering typically lawsuit

costs run from $100,000 (a cheap one) to $1,000,000 or more. Knowing that Paris declared bankruptcy in April 2016, and his lack of business, Paris has no money to start a lawsuit. And no attorney would touch a lawsuit such as Paris proposes on a contingency basis." The claims are defamatory on their face.

221.    The Smith site also uses photos of Paris without permission (See attached Exhibit "77").

222.    In addition, Smith falsely asserts that Paris has sold the email information of Oxebridge readers "on the Dark Web."

223.    Since Smith updates the site frequently there may be many additional defamatory claims since this suit was filed.

224.    The websites operated by Smith include material provided by Daryl Guberman and Levinson and/or links to their material. The home page of oxebridgequalitylawsuits.com (See attached Exhibit "77") includes a link to the defamatory material published by defendant Guberman at http://dguberman.com/warning-about-oxebridge-quality-resources-and-its-owner-chris-paris/. The site also includes a link to the pro-Levinson blog article on St. Petersblog (See attached Exhibit "67").

225.    On the following page, "oxebridgequalitylawsuits.com/Oxebridge-Fundrazr-lies.html" (See attached Exhibit "77"), Smith makes numerous defamatory and false claims for the purpose of harming Paris' legal defense, including the defamatory statement that Oxebridge's work in the field may include litigation, where Smith published, "This is knowingly false.

226.    Smith also printed the following false statement, "Think about it - Mr. Paris wants to start Class Action lawsuit(s) against "industries" including automotive, aerospace, IT, and manufacturing firms. As if these industries can not stand up for themselves." In reality, Paris

never stated an intention to sue any of these industries.

227.　　Smith also engages in "doxing" through the repeated republication of portions of Paris' bankruptcy papers, with the intent to reveal Paris' private information for the purposes of harassment, intimidation and humiliation. The documents republished by Smith include Paris private address, information about his family, financial information, and more. The list of sub-pages on the Smith website (See attached Exhibit "69") and (See attached Exhibit "70") show these documents on the Smith website.

## COUNT I – DEFAMANTION / LIBEL AGAINST WILLIAM LEVINSON, LEVINSON PRODUCTIVITY SYSTEM, PC, MARC SMITH, DARYL GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

228.　　Plaintiffs incorporate paragraphs 1 – 227 as though fully set forth herein.

229.　　The Levinson Entities, Smith, Labelle, Guberman, and Guberman PMC, published false and defamatory statements concerning Chris Paris and Oxebridge as referenced above.

230.　　Levinson, Levinson Productivity, Smith, Labelle, Guberman, and Guberman PMC published those statements, without reasonable care as to whether those statements were true or false. Indeed, there was knowledge that the statements were false. The statements were defamatory *per se.*

231.　　Levinson, Levinson Productivity, Smith, Labelle, Guberman, and Guberman PMC knew the statements were false.

232.　　The Levinson Entities, Smith, Labelle, Guberman, and Guberman PMC published those statements out of malice, bad faith, and hatred towards Paris.

233.　　The Levinson Entities, Smith, Labelle, Guberman, and Guberman PMC published the statements in order to inflict reputational and business harm on Paris.

234.　　The recipients of those articles and videos saw content which defamed Paris. This

resulted in actual damage to Paris, including being subjected to hatred, distrust, ridicule, contempt and disgrace.

235. The false statements also tended to injure Paris in his business or profession, and in fact did injure Paris in that manner. As a result, Paris lost business, customers, and potential business and customers. Paris was also damaged *per se*.

236. WHEREFORE, Plaintiffs demand and are entitled to collect damages from The Defendants, pre and post judgment interest, on each award, and such other relief that the Court determines appropriate.

### COUNT II – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP AGAINST WILLIAM LEVINSON, LEVINSON PRODUCTIVITY SYSTEM, PC, MARC SMITH, DARYL GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

237. Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

238. Paris had business relationships with companies that were subject to third party audits for compliance standards.

239. The plaintiffs' business relationships were adversely affected by the writings, videos, and misrepresentational information of Levinson, Levinson Productivity, Smith, Labelle, Guberman, and Guberman PMC.

240. Comments from Levinson, Levinson Productivity, Smith, Labelle, Guberman, and Guberman PMC concern the desire to damage Paris's business.

241. Levinson, Levinson Productivity, Smith, Labelle, Guberman, and Guberman PMC had no right to interfere with Paris' business relationships and wrongfully interfered with those business relationships out of malice, bad faith, and hatred.

242. The Plaintiffs have suffered damage as a result of the interference with Oxebridges' pre-existing business relationships.

243.    WHEREFORE, Plaintiffs demand and are entitled to collect damages from The Defendants, pre and post judgment interest, on each award, and such other relief that the Court determines appropriate.

## COUNT III -- FEDERAL ANTI-CYBERSQUATTING (ANTI-CYBERPIRACY) (15 U.S.C. § 1125(D)(1)(A)) AGAINST LEVINSON AND SMITH

244.    Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

245.    Upon information and belief, Levinson registered and/or use in bad faith the domain Levinson registered the domain name www.oxebridge.biz, "Osteinfo.net, "Oxebridge.biz website, and "oxefake.com" which included the exact same content.

246.    Smith registered the Oxebridge.co website under the fake name "John Peachfarm." He used a Neomailbox.com email address for Peachfarm in his domain registration, and published this on the Oxebridge.co website; Smith personally responded to emails sent to "Peachfarm." In addition, Smith has repeatedly used photos of Paris and material from the Oxebridge Website without permission and posted material on the website www.oxebridgequalitylawsuits.com

247.    These marks incorporate a mark confusingly similar to the Oxebridge trademark.

248.    The Infringing Domains are substantially indistinguishable from, confusingly similar to and/or dilutive of the Oxebridge trademark in violation of the Anti-Cybersquatting Consumer Act, 15 U.S.C. § 1125(d)(I)(A)(ii)(I).

249.    Levinson and Smith's registration and/or use of the Infringing Domain is not sponsored or authorized by Oxebridge.

250.    Levinson and Smith have no trademark or other intellectual property rights in the Infringing domains, and has acted in bad faith with the intent to profit from the goodwill of the Oxebridge trademark.

251.   Levinson and Smith had no bona fide commercial use of the infringing Domain as the site offered no products or services for sale.

252.   Upon information and belief, Levinson and Smith registered numerous other domains containing trademarked terms with no intention other than to disparage the identity of the actual intellectual property rights' holders' aforementioned acts constitute Cybersquatting (Cyberpiracy) in violation of 15 U.S.C. § 1125(d)(l)(A).

253.   WHEREFORE, by reason of the foregoing, Levinson and Smith are liable to for (a) Plaintiffs' actual damages and Defendants' profits; or (b) statutory damages in an amount up to $100,000 for each instance of cybersquatting as provided by 17 U.S.C. § 1117(d).

## COUNT IV - TRADEMARK INFRINGEMENT (15 U.S.C. § 1114) AGAINST LEVINSON AND SMITH

254.   Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

255.   Plaintiffs have owned the website https://www.oxebridge.com since 1999.

256.   Levinson and Smith have used Oxebridge's registered trademark, Oxebridge Quality Resources International, LLC, in the infringing domains, knowing it's the exclusive property of Oxebridge, in connection with the infringing domains.

257.   Levinson and Smith engaged in the aforementioned activity with the intent to confuse and deceive the public into believing that they are in some way sponsored, affiliated or associated with Oxebridge, when in fact, they are not.

258.   Levinson and Smith's use of the Oxebridge's registered trademark in the Infringing Domains have been without the consent of Oxebridge, is likely to cause confusion and mistake in the minds of the public and, in particular, tends to and does falsely create the impression that they are warranted, authorized, sponsored or approved by Oxebridge when, in fact, they are not.

259.    Levinson and Smith's unauthorized use of the Oxebridge's Registered Trademarks in the Infringing Domain has resulted in Levinson's own competing business being benefitted by the misconduct by Levinson has caused and continues to cause substantial and irreparable injury to the public, Oxebridge, the Oxebridge Registered Trademark, and the substantial goodwill represented thereby.

260.    WHEREFORE, Levinson and Smith's acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114. By reason of the foregoing, Levinson and Smith are liable to Oxebridge for: (a) an amount representing three (3) times Oxebridge's damage and; and (b) reasonable attorney's fees and pre-judgment interest pursuant to 15 U.S.C. § 1117.

## COUNT V –FLORIDA UNFAIR COMPETITION –
## TRADEMARK INFRINGEMENT AGAINST LEVINSON AND SMITH

261.    Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

262.    This is a common law unfair competition claim for damages and injunctive relief.

263.    Oxebridge is the prior user of the trademark at issue.

264.    Oxebridge's trademark and/or related design elements are inherently distinctive.

265.    Levinson and Smith used an identical or confusingly similar trademarks and domain names in order to disparage a competing business.

266.    Levinson and Smith thereby competed with Plaintiffs in the same trade area where Oxebridge has established good will.

267.    Levinson and Smith's activities as stated herein constitute unfair competition and an infringement of CCTV Outlet Corp.'s common law trademark rights in the name the Plaintiff Marks within the State of Florida and in violation of Florida law.

268.    Levinson and Smith's wrongful and infringing activities have caused and continue to

cause injury and damage to Plaintiff's reputation and good will in Oxebridge in the form of a diversion of customers, lost sales and lost profits.

269. In the alternative, Levinson and Smith's wrongful and infringing activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to plaintiffs' business, reputation and good will in the Oxebridge. Plaintiffs have no adequate remedy at law.

270. WHEREFORE, Plaintiffs demand and are entitled to collect damages from The Levinson and Smith, pre and post judgment interest, on each award, and such other relief that the Court determines appropriate.

## COUNT VI – MISREPRESENTATION OF COPYRIGHT CLAIMS UNDER THE DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA") 17 U.S.C. § 512 AGAINST DARYL GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

271. The Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

272. Guberman, Guberman PMC, and Donald Labelle knowingly filed false DMCA claims against the Plaintiffs.

273. Upon information and belief, Plaintiffs did not infringe any copyright owned or administered by Defendant Guberman, Guberman PMC, or Donald Labelle.

274. Any use of any materials or information by Plaintiffs was a self-evident, non-infringing, and fair use under 17 U.S.C. § 107.

275. Plaintiffs did not use any materials or information of or concerning Guberman, Guberman PMC, or Donald Labelle.

276. Upon information and belief, Guberman, Guberman PMC, and Donald Labelle knew or should have known that Plaintiffs did not infringe any copyrights on the date they sent their DMCA takedown notices.

277. Guberman, Guberman PMC, and Donald Labelle sent the DMCA notices for the purpose of interfering with Plaintiffs' business and/or for the purpose of suppressing criticism of its products or business practices.

278. This is an improper use of the DMCA takedown scheme, and is specifically prohibited by law. 17 U.S.C. § 512(f).

279. Guberman, Guberman PMC, and Donald Labelle violated 17 U.S.C. § 512(f) by knowingly materially misrepresenting that Plaintiffs infringed Defendants Guberman, Guberman PMC, and Donald Labelle's copyrights.

280. Defendants Guberman, Guberman PMC, and Donald Labelle actually knew of the material falsity of its representations, as it pertains to Plaintiffs.

281. 17 U.S.C. § 512(F) states that anyone 1) who misrepresents that a material or activity is infringing, (2) that material or activity was removed or disabled by mistake or misidentification shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized, licensee or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

282. Accordingly, in this instance, Guberman, Guberman PMC, and Donald Labelle intentionally filed claims in which they knew or had reason to know were strictly satirical in nature.

283. Furthermore, Guberman, Guberman PMC, and Donald Labelle filed claims to which they had no claim simply so they could injure Plaintiff's business interests.

284. Guberman, Guberman PMC, and Donald Labelle actually knew of the material falsity of its representations with respect to copyright infringement, as it knew that Plaintiff's use of its allegedly copyrighted images was fair use.

285. In the alternative, Defendants Guberman, Guberman PMC, and Donald Labelle knew of the material falsity of its representations with respect to copyright infringement, as it knew independently that Plaintiff's use of the allegedly copyrighted images was fair use.

286. Defendants Guberman, Guberman PMC, and Donald Labelle used the DMCA process to suppress speech and not in order to address real copyright concerns.

287. If Defendants Guberman, Guberman PMC, and Donald Labelle did not know of the material falsity of its representations, then they were willfully blind as to the material falsity.

288. As a direct and proximate result of Defendants Guberman, Guberman PMC, and Donald Labelle's actions, Plaintiffs have been injured in an amount to be determined at trial.

289. Such injury includes, but is not limited to, the financial and personal expenses associated with responding to the complaint and harm to Plaintiffs' free speech rights under the First Amendment.

290. WHEREFORE, Plaintiffs have been forced to retain the services of an attorney to pursue this action, and are entitled to recover its attorney's fees and any and all costs associated with pursuing this matter, as permitted under 17 U.S.C. §512(f). In the alternative, Plaintiffs ask for attorney fees as damages due to the bad faith actions of Defendants Guberman, Guberman PMC, and Donald Labelle.

## COUNT VII: ABUSE OF PROCESS AGAINST DARYL GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

291. Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

292. Defendants Guberman, Guberman PMC, and Donald Labelle used the DMCA process, including a false sworn statement, to accomplish a purpose for which the DMCA notice and takedown procedure was not designed.

293. The false and perjurious DMCA notice was used by the Defendants Guberman, Guberman PMC, and Donald Labelle to suppress criticism, and not to address any copyright

concerns.

294.  The false and perjurious DMCA notices were filed in order to seek to extract an advantage over the Plaintiffs and/or to suppress criticism, and not to address any actual copyright claims.

295.  Defendants Guberman, Guberman PMC, and Donald Labelle deliberately perverted this particular legal process for its own benefit and in order to suppress the Plaintiffs' rights.

296.  Defendants Guberman, Guberman PMC, and Donald Labelle were willful and wanton and were committed with deliberate disregard for the law, including the copyright act and laws prohibiting perjury.

297.  As a direct and proximate result of Defendants Guberman, Guberman PMC, and Donald Labelle actions, Plaintiffs have been injured in an amount to be determined at trial.

298.  WHEREFORE, Plaintiffs have been forced to retain the services of an attorney to pursue this action, and they are entitled to recover their attorney's fees and any and all costs associated with pursuing this matter. In the alternative, Plaintiffs ask for attorney fees as damages due to the bad faith action of Defendants Guberman, Guberman PMC, and Donald Labelle in these matters.

## COUNT VIII: WIRETAPPING, VIOLATION OF FLORIDA STAUTE 934.03, AGAINST DARYL GUBERMAN

299.  Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

300.  Section 2511 of the Wiretap Act prohibits individuals from intercepting a communication or procuring another to intercept a communication. 18 U.S.C. § 2511; Bartnicki v. Vopper, 532 U.S. 514, 523 (2001). Any individual whose communication is "intercepted, disclosed, or intentionally used" can bring a civil action for injunctive relief and monetary damages. 18 U.S.C. § 2520; Kwok Sze v. Pui-Ling Pang, 529 F. App'x 196, 199 (3d Cir. 2013).

301.  A plaintiff pleads a prima facie case under the Wiretap Act by alleging that the defendant: (1) intentionally (2) intercepted, endeavored to intercept, or procured another

person to intercept (3) the contents of (4) any wire, electronic, or oral communication, (5) using a device. In re Nickelodeon Consumer Privacy Litig., No. 15-1441, slip op. at 25 (3d Cir. Jun. 27, 2016); In re Google Inc. Cookie Placement Consumer Privacy Litig., 806 F.3d 125, 135 (3d Cir. 2015).

302. Defendant Guberman recorded a phone conversation with plaintiff, without plaintiffs' consent, which is a direct violation of Fla. Stat. § 934.03.

303. The phone conversation between the Paris and Guberman on June 22, 2017 constitutes a "wire communication" pursuant to Florida's Security of Communications Act.

304. Defendant Guberman's act of recording the phone conversation without plaintiffs' consent constitutes an "interception" of the parties June 22, 2017, wire communication.

305. During the illegal recording on June 22, 2017 between the parties, Defendant Guberman knew, or had reason to know, that plaintiff was physically located within the State of Florida.

306. Defendants Guberman's act of recording the June 22, 2017 wire communication between the parties was intentional.

307. As a result of Defendants Guberman's interception of the parties' communication, plaintiffs have suffered damages.

308. WHEREFORE, Pursuant to Fla. Stat.§ 934.10, plaintiff seeks an injunction barring defendant from intercepting additional wire communications, an order to remove from the world wide web the recording on June 22, 2017, as well as compensatory damages, punitive damages, attorneys' fees and costs.

**COUNT IX: INTERCEPTION OF ELECTRONIC COMMUNICATIONS IN VIOLATION OF THE WIRETAP ACT, 18 U.S.C. § 2511(1)(A) AGAINST DEFENDANT GUBERMAN**

309. Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

310. Defendant Guberman intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Chris Paris, in violation of 18 U.S.C. § 2511(1)(a).

311. Guberman was not acting under person not acting under color of law and had no authority to tape the conversation.

312. WHEREFORE, Plaintiffs seek an injunction barring Guberman from intercepting additional wire communications, an order to remove from the world wide web the recording on June 22, 2017, as well as compensatory damages, punitive damages, attorneys' fees and costs.

## COUNT X: FOR DISCLOSURE OF INTERCEPTED ELECTRONIC COMMUNICATIONS IN VIOLATION OF THE WIRETAP ACT, 18 U.S.C. § 2511(1)(C) AGAINST DEFENDANTS GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

313. Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

314. Guberman taped a two-way conversation to which Paris did not consent as he was unaware that he was being recorded at all times.

315. Defendants Guberman, Guberman PMC, and Donald Labelle intentionally disclosed the intercepted electronic communications of the Plaintiffs to other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants Guberman, Guberman PMC, and Donald Labelle have violated 18 U.S.C. § 2511(1)(c).

316. Guberman acted in concert with Labelle in disseminating the illegally recorded conversation over the world wide web.

317. WHEREFORE, Plaintiffs seeks an injunction barring the interception of additional wire communications, an order removing from the world wide web the recording on June 22, 2017, as well as compensatory damages, punitive damages, attorneys' fees and costs.

## COUNT XI: (INVASION OF PRIVACY-INTRUSION UPON SECLUSION) AGAINST DEFENDANTS GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

318.   Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

319.   Defendants Guberman's act of intercepting the wire communication between herself and plaintiff constitutes an invasion of privacy in violation of Florida law.

320.   Through the act of intentionally intercepting communications and subsequently posting the defamatory material online Defendants Guberman, Guberman PMC, and Donald Labelle deliberately intruded upon the seclusion of Chris Paris in violation of Florida law.

321.   Plaintiff Paris has a recognized right of privacy in his wire communications. Defendant Guberman's act of intentionally intercepting the wire communication is illegal pursuant to Florida's Security of Communications Act (Fla. Stat.§ 934.03).

322.   The act of then publishing and disclosing the contents of the illegally taped conversation also violated Plaintiff Paris' right to privacy.

323.   Therefore, Defendants Guberman, Guberman PMC, and Donald Labelle conduct is objectively unreasonable and offensive so as to support a claim for invasion of privacy.

324.   Defendants Guberman has intercepted and published other wire communications between herself and plaintiffs, although publication is not required to support a claim of invasion of privacy based upon intrusion upon seclusion.

325.   As a result of defendant's Guberman, Guberman PMC, and Donald Labelle intentional invasion of his right of privacy, plaintiff has suffered damages.

326.   WHEREFORE, Plaintiffs demand and are entitled to collect damages from The Guberman, Guberman PMC, and Donald Labelle, pre and post judgment interest, on each award, and such other relief that the Court determines appropriate.

### COUNT XII: CIVIL CONSPIRACY AGAINST WILLIAM LEVINSON, LEVINSON PRODUCTIVITY SYSTEM, PC, MARC SMITH, DARYL GUBERMAN, GUBERMAN PMC, AND DONALD LABELLE

327.   Plaintiffs incorporates paragraphs 1 – 227 as though fully set forth herein.

328.   The elements of a civil conspiracy are:  (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed

62

pursuant to the conspiracy. Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County, 616 So.2d 562 (Fla. 5th DCA 1993). Generally an actionable conspiracy requires an actionable underlying tort or wrong. See Florida Fern Growers Ass'n, Inc.; Wright v. Yurko, 446 So.2d 1162 (Fla. 5th DCA 1984).

329. However, an alternative basis for a civil conspiracy claim exists where the plaintiff can show some "peculiar power of coercion" possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess. See Churruca v. Miami Jai-Alai, Inc., 353 So.2d 547 (Fla.1977)

330. In this case the Defendants all worked together with the common goal of tortuously interfering with the Plaintiffs and spreading misinformation and lies all over the Internet.

331. The Defendants acted unlawfully by disseminating lies that disparaged Paris all over the Internet. They all took overt acts in furtherance of that conspiracy.

332. In addition, the Defendants certainly exhibited a unique power of coercion, which individually they did not possess individually, which caused Paris to lose lucrative contracts and speaking engagements.

333. Accordingly, Paris was damaged in an amount to be determined at trial.

334. WHEREFORE, Plaintiffs demand and are entitled to collect damages from The Defendants, pre and post judgment interest, on each award, and such other relief that the Court determines appropriate.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL.**

**VERIFICATION**

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

**CHRIS PARIS**
OXEBRIDGE QUALITY RESOURCES
INTERNATIONAL, LLC

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and complete copy of this document was electronically filed with the clerk of courts in Middle District of Florida on the 18th day of February 2019.

Respectfully submitted,

Shrayer Law Firm, LLC.
912 South Andrews Avenue
Fort Lauderdale, FL 33316
Tel.   (954) 601-3732
Email: ghs@shrayerlaw.com

**/s/Glen H. Shrayer**

Glen H. Shrayer, Esq.
Fl Bar No. 57253